THE MAYOR AND ALDERMEN OF JERSEY CITY AND MARK M. FAGAN v. THE STATE BOARD OF ASSESSORS AND UNITED NEW JERSEY RAILROAD AND CANAL COMPANY (PENNSYLVANIA RAILROAD COMPANY, LESSEE).

Submitted December 5, 1905—Decided February 26, 1906.

1. Whether lands under tidewater beyond the exterior line for solid filling, established by the riparian commissioners, are assessable as land by a description which includes them, depends upon the right which has been acquired therein.

2. If a title has been acquired to lands under water beyond the exterior line for solid filling, those lands should be included with the land back of that line in a single description or separately assessed by a distinct description.

3. If only a right has been acquired in the lands under water beyond the exterior line for solid filling, as appurtenant to the land back of that line, the value of the right is properly included in an assessment upon the land back of the line.

4. What is the "main stem" of a railroad under the act of 1888 (*Gen. Stat., p.* 3324) is the question of fact depending upon the actual use of the line at the time of assessment.

5. As between a line used mainly for passenger traffic and a line used mainly for freight traffic, the former is the "main stem."

On *certiorari.*

Before Justices DIXON, GARRISON and SWAYZE.

For the prosecutors, *George L. Record* and *Robert Carey.*

For the defendants, *James B. Vredenburgh.*

The opinion of the court was delivered by

SWAYZE, J. This writ presents for review the action of the state board of assessors upon a complaint of the mayor and aldermen of Jersey City and Mark M. Fagan, a resident and taxpayer, under section 12 of the amendatory act of March 27th, 1888, for the taxation of railroad and canal property. *Gen. Stat., p.* 3328, *pl.* 223.

The complaint, as far as concerns the defendants, was that the board had omitted to tax certain lands under the waters of the Hudson river, and had taxed as "main stem," under subdivision 1 of section 3 of the act, property which should have been assessed as "other real estate," under subdivision 2.

The title to the lands under water is derived in part from two acts of the legislature—of March 30th, 1868 (*Pamph. L., p.* 551), and March 31st, 1869 (*Pamph. L., p.* 1026); in part under a riparian lease made by the riparian commissioners to William E. Dodge, dated April 18th, 1871; in part from a riparian grant made by the commissioners to the Pennsylvania Coal Company, dated December 2d, 1869, and in part under a grant made by the commissioners to the United New Jersey Railroad and Canal Company, dated September 20th, 1879.

The state board, by the return to the writ, show that they have not assessed these tracts of land by a separate description, but have included the value in the assessments of lands in the rear thereof back of the exterior line for solid filling.

The proper method of assessment must be determined by the nature of the title of the defendants. If the defendants have title to the land under water, that land should be included with the land back of the exterior line for solid filling in a single description, or separately assessed by a distinct description. It should not be altogether omitted from the assessment and treated merely as increasing the value of the land back of the line. If, on the other hand, the defendants have only a right in the land under water as appurtenant to the land back of the exterior line for solid filling, the value of that right is properly included in an assessment upon the land back of the line.

The act of 1868 granted to the United Companies, one of the defendants, their successors and assigns, the right and title of the state to the land lying between high-water mark on the west and deep water of the Hudson on the east, to have, hold, possess and enjoy as the joint board of directors might deem requisite and necessary for the transaction of their business, and made it lawful for the United Companies to fill up and improve the property, and erect wharves, piers, storehouses, depots and other improvements. By the act of 1869 the companies were authorized to reclaim and erect wharves and other improvements in front of any lands then owned by or in trust for them, or either of them, adjoining Kill von Kull or any other tidewaters of this state, and, when so reclaimed and improved, to have, hold, possess and enjoy the same as owners thereof, subject to the regulations, where applicable, of the riparian commissioners as to the line of solid filling and as to pier lines.

The land has been improved and for years has been used as a railway terminal. The title thus granted is a fee-simple. *Fitzgerald* v. *Faunce,* 17 *Vroom* 536.

The lease and the grants from the riparian commissioners first describe tracts of land back of the exterior line for solid

filling, and then describe the land under water lying between that exterior line and the exterior line for piers. Then in the lease follows a grant of the right, liberty, privilege and franchise of building piers *alone* upon the land thus mentioned, and in the grants follows a proviso that the land under water is to be used *only* for the purposes of a pier or piers. The title conveyed by these instruments is restricted by this language. *Polhemus* v. *Bateman,* 31 *Vroom* 163.

But the companies have actually built the piers in accordance with the privilege granted, and have thus acquired an estate in the lands, although the use thereof is limited by the words of the grant. *Fitzgerald* v. *Faunce,* 17 *Vroom* 536, 597.

We think the title of the defendants under the statutes and riparian lease and grants was such that the land under water should have been described in the assessment.

The error was merely an error of description. The value put upon the land described in the assessment included the value of the land under water immediately in front. There is no evidence that the two tracts are worth more than the valuation put upon one alone. Our authority under the statute is to reduce or increase the assessment, as may be just, or refer it back to the board of assessors to correct or re-assess the same. We have no evidence before us to justify a reduction or increase, but the assessment must be referred back to the state board in order that the description may be amended. This description may be of importance if it becomes necessary to sell the property of the company for taxes pursuant to section 15 of the act of 1888. *Gen. Stat., p.* 3329, *pl.* 226.

The second ground of complaint to the state board was that three portions of railroad track were assessed as main stem at one-half of one per centum instead of at the higher rate for other real estate used for railroad purposes. These three portions of track are designated on the map in evidence as (a), (b) and (c). That designated (a) formed part of the filed survey of the main line of the New Jersey Railroad and Transportation Company. The track was subsequently straightened and the new portion used principally for pas-

senger traffic. Track (a) continued to be used for the business of the road, but almost exclusively for freight. It is only twenty-eight hundredths of a mile in length.

Track (b) was a part of the filed survey of the main line of the New Jersey Railroad and Transportation Company. The tracks were subsequently straightened and track (b) is now used principally for a branch to the yard of the railroad company and to the National Docks railroads. It is only thirty-seven hundredths of a mile in length.

The new tracks which have been built to straighten the line as above stated are assessed as part of the main stem.

Track (c) was built under authority of an act of 1868 (*Pamph. L., p.* 551) and an act of 1869 (*Pamph. L., p.* 560), and is used principally for freight business to the Harsimus yard. It is a mile and two-thirds in length from the point of intersection with the other line of the railroad. Both the latter line and the Harsimus branch were assessed as main stem. In the act of 1868 the track (c) is spoken of as a branch railroad, and in the act of 1869 it is spoken of as a branch railroad to connect the property at Harsimus cove with the "main line" of the New Jersey railroad.·

We think the state board of assessors was wrong in assessing tracks (a), (b) and (c) as main stem. The board was perhaps led to this action by what was said in the opinion of this court under the original act of 1884 (*Central Railroad Co.* v. *State Board of Assessors,* 20 *Vroom* 1, at *p.* 18), where Chief Justice Beasley said that each branch road must be assessed in part as main stem and in part as property used for railroad purposes. But the court in that case was dealing with section 6 of the act of 1884 (*Pamph. L., p.* 145), which directed the assessors, where there were several branch lines belonging to or controlled by one company or operated under one management, to designate one of the lines as main stem. What the court decided was that it was not competent for the state board, even under legislative authority, to designate arbitrarily one of the lines as main stem and the others as branches. The Chief Justice was careful to say that under the decision of the Court of Errors and Appeals affirming the

constitutionality of the act of 1884, "no reason is perceived why the lawmakers were not competent to separate these branch roads, already indicated, into groups, with a view to taxing them at different rates.   *   *   *   The consequence is that had the legislature itself declared that where there were several branch roads in one taxing district, a particular one of such roads should be treated as the main stem and taxed accordingly, and that the others should be taken as branches, and, as such, taxed at a greater rate, I could not have judicially pronounced, whatever my private views may be, such an exercise of power illegitimate, because the existence of such a power has been recognized, as I deem it clear, by the Court of Last Resort."

After the decision of the case just cited the amendatory act of 1888 was passed and the section thus condemned was omitted.   The amendatory act of 1888 provides for the assessment of the main stem at one rate and other real estate at another rate.   What is main stem is left to be determined as a matter of fact, not by anyone's arbitrary determination.   The power of the legislature to make this distinction and its power to define main stem has been vindicated in the courts.   It remains only to determine, in each particular case, which line of track answers the legislative definition.   There is no distinct definition of main stem in the statute, and its meaning must be gathered from the different statutory provisions.   The provision that the term main stem shall be held to include "the road bed not exceeding one hundred feet in width" indicates that one line only was intended, and the use of the word "main" itself points in the same direction.   It must be an unusual case where two lines belonging to the same railroad are of equal importance.   Section 3 enacts that the main stem shall include "depot buildings used for passengers connected therewith." This indicates that in the usual case of a railroad carrying both passengers and freight, the line used for passenger traffic, as distinguished from a line used for freight traffic, is the main stem, and it follows that where there are two lines used for both freight and passenger traffic, that is the main

stem upon which the passenger traffic is mainly carried. The question in each case is a question of fact, depending upon the actual use of the line at the time of assessment.

In the present case we find as a fact that the line (a), which is used almost exclusively for freight, so far as it lies outside of the hundred feet strip on which is the passenger line, is not "main stem." To that extent it is assessable as other real estate under subdivision 2.

We find that line (b), which is used principally for a branch to the yard and to the National Docks railroad, so far as it lies outside of the hundred feet, is not "main stem." To that extent it is assessable as other real estate.

We find that line (c), which by the statute authorizing it was designated as a branch, and is used principally for freight business to connect with the Harsimus yard, so far as it lies outside of the hundred feet, is not main stem. To that extent it is assessable as other real estate.

These three lines were erroneously assessed as main stem. We have no facts before us which enable us to determine the value of these portions of the railroad, and the assessment must therefore be referred back to the board of assessors for correction and re-assessment in accordance with the views herein expressed.